1  EMILYROSE JOHNS, SBN 294319
   SIEGEL, YEE, BRUNNER & MEHTA
2  475 14th Street, Suite 500
3  Oakland, California 94612
   Telephone: (510) 839-1200
4  Facsimile: (510) 444-6698
   Email: emilyrose@siegelyee.com
5

6  DEBORAH M. GOLDEN, *Pro Hac Vice Forthcoming*
   GOLDEN LAW
7  700 Pennsylvania Ave. SE, 2nd Floor
   Washington, DC 20003
8  Telephone: (202) 630-0332
   Email: dgolden@debgoldenlaw.com
9

10 *Attorneys for Plaintiff*

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14

15 H. M.,                              ) Case No.
                                       )
16        Plaintiff,                   ) **COMPLAINT FOR DAMAGES AND JURY**
                                       ) **DEMAND**
17     vs.                             )
                                       )
18 UNITED STATES OF AMERICA, TYRONE    )
19 MILLER,                             )
                                       )
20        Defendants.                  )
                                       )
21 _____ )

22                          **INTRODUCTION**

23        1.    Plaintiff H. M. served a twelve-year sentence in the Bureau of Prisons ("BOP") and

24 was housed at the Federal Corrections Institution Dublin, known openly at the time as "the Rape

25 Club."

26        2.    During her last months at FCI Dublin, Plaintiff H.M. began to receive mental health

27 services from Tyrone Miller, who held himself out as a psychologist. During their sessions, where

28 H.M. shared vulnerable and intimate details about her past trauma, Dr. Miller groomed Plaintiff

H.M. into a sexual relationship with him, fondling her and kissing her while she remained in prison. On the day of H.M.'s release from FCI Dublin, Dr. Miller picked H.M. up from the grounds of FCI Dublin—in his personal vehicle—and brought her to his house in Northern California to have sex with her and then drove her to her residence in Southern California. While she remained on supervised release for nearly two years after, he continued to pursue and stalk her.

3. Because of the culture within FCI Dublin, Dr. Miller's position and power within the BOP, and Dr. Miller's professed past training within the military and CIA, H.M. did not think anyone would believe her if she were to come forward, and she feared what Dr. Miller might do if she revealed his abuse.

4. The BOP did nothing to protect her.

## JURISDICTION AND VENUE

5. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

6. This action involves claims arising under United States and California laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

7. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

8. Assignment is appropriate in the Oakland Division of this Court because that is where "a substantial part of the events or omissions giving rise to the claim[s] occurred." Furthermore, several related cases have already been assigned to District Judge Yvonne Gonzalez Rogers, and Plaintiff H. M. will be filing an administrative motion to relate this case to those other cases.

## PARTIES

9. Plaintiff H. M. was at all times relevant here incarcerated in FCI Dublin, in the custody of the BOP, and/or residing in Valencia, California.

10. Defendant United States of America Federal Bureau of Prisons ("BOP") is a governmental entity that operates and is in possession and control of the Federal Correctional

1 | Institute Dublin ("FCI Dublin"). FCI Dublin was a federal female low-security correctional
2 | institution that closed in April 2024.

3 |      11.     Defendant Tyrone Miller was a mental health worker with the Residential Drug
4 | Abuse Program ("RDAP") who held himself out as a licensed psychologist during the relevant
5 | period and is sued in his individual capacity. While performing the acts and omissions that
6 | Plaintiffs allege in this complaint, Dr. Miller was acting within the scope of his official
7 | employment, or with the BOP's permission and consent and under color of federal law.

8 |      12.     While acting and failing to act as alleged herein, Defendants had complete custody
9 | and total control of Plaintiff H. M. Plaintiff H. M. was dependent upon Defendants for her
10 | personal security, necessities, and mental health care.

11 |      13.     In performing the acts and/or omissions contained herein, Defendants, and each of
12 | them, acted under color of federal law, and Plaintiff H. M. is informed and believes each acted
13 | maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate
14 | indifference to the rights and personal security of Plaintiff H. M.. Each of them knew or should
15 | have known that their conduct, attitudes, actions, and omissions were, and are, a threat to
16 | Plaintiff H. M. and to her constitutionally and statutorily protected rights. Despite this
17 | knowledge, Defendants failed to take steps to protect Plaintiff H. M. and to ensure her rights to
18 | safety from sexual assault.

19 | **FACTS**

20 |      14.     From 2006 through 2021, Plaintiff H. M. was held at FCI Dublin.

21 |      15.     During that time, Plaintiff H. M. became intimately familiar with why FCI Dublin
22 | was known as "the Rape Club".

23 |      16.     She experienced sexual harassment and abuse from guards regularly and saw such
24 | abuse happening to other women at Dublin.

25 |      17.     Officer Wolf would regularly show Plaintiff H. M. his penis and make sexual
26 | comments to her.

27 |      18.     Officer Phillips would open the shower curtain while she was showering so that he
28 | could look at her while she was nude.

19.    Officer Olivera would make frequent sexual comments to her about her body.

20.    Officers observed her while in the shower, propositioned her to expose her breasts, vagina, and/or buttocks during count, and did unnecessary and aggressive strip searches that appeared to be performed for the sexual gratification of the officers.

21.    This conduct occurred openly and with no consequence for the officers engaged.

22.    When women would report officers for misconduct, their cells would be searched and their belongings taken, they would be forced to move into more dilapidated cells, they would be housed with prisoners with histories of violence against other prisoners, or they would be sent to the Special Housing Unit.

23.    Plaintiff H. M. developed a sense of conditioned hopelessness that sexual abuse would happen, no one would do anything, and she had to maneuver her time in prison to avoid this abuse as best she could.

24.    In 2017, Plaintiff H. M. was accepted into the RDAP program.

25.    She began seeing Counselor Tyrone Miller, who held himself out as a licensed psychologist.

26.    Dr. Miller encouraged Plaintiff H. M. to share intimate details of her life with him. These inquiries went well beyond the typical therapeutic relationship.

27.    At his urging, Plaintiff H. M. told him about her history as a victim of sexual abuse.

28.    She told him that she had never had healthy relationships with men.

29.    She told him about the sexual abuse she witnessed and experienced at the prison.

30.    Dr. Miller feigned disgust at the actions of the correctional officers, encouraging H.M. to believe that he was one of the "good ones" and not like the other officers at FCI Dublin. However, he never encouraged her to report the behavior, thus reinforcing the normalcy of the sexual abuse and violence at FCI Dublin and the idea that that was just how it was in that prison.

31.    Again, at his urging, Plaintiff H. M. confided in him that she was worried about her release.

32.    She told him that due to her length of incarceration, she was afraid that she would not be able to build healthy relationships back home.

33.     Plaintiff H. M. shared with him details about her son and that she otherwise did not have much family.

34.     She trusted him as a professional and someone who was going to help her reintegrate into society.

35.     Plaintiff H. M. saw Dr. Miller every week day for nine months.

36.     Dr. Miller slowly started guiding their conversations into less clinical inquiries, asking her about what she had for dinner and what she did for workouts. He would also share personal details about himself with her.

37.     He would keep her long past their sessions, and she would have to rush to make it back to her housing unit for count.

38.     He began to look at her lustfully but refrained from touching her at first. He gave her personal compliments on her looks and appearance. During this time, she could feel a shift in their dynamic, to one that had turned romantic and no longer seemed professional.

39.     He told her to listen to specific romantic and intimate songs with the idea that she would have him in mind while listening.

40.     He manufactured romantic tension but insisted on propriety. This reinforced to H.M. that Dr. Miller was one of the "good ones" and that he really cared about her. These are classic examples of grooming.

41.     On one occasion, when she was closer to her release date and after he had spent months subtly suggesting to Plaintiff H. M. that he felt lustful towards her, he took her into her arms and kissed her.

42.     He did this on several more occasions while she was under his care.

43.     Dr. Miller also groped Plaintiff H. M.'s buttocks when he was supposed to be providing her with therapy and counseling.

44.     Dr. Miller told her he needed to see her on the outside. He began pressuring her to change her release plans, which at the time were to go to Montana where her son was.

45.     He told her he wanted her to stay in California.

46.     Even if Plaintiff H. M. wanted to discuss other things in her counseling sessions, he steered their discussion to how she should remain in California.

47.     He encouraged her to seek to live with a step-aunt in Valencia, California, so that he could remain close to her.

48.     He began to talk about their future. He told her that they would be together when she was out and that after two years, they could live together.

49.     On the day of her release in February 2018, Dr. Miller picked her up and started the six-hour drive to Valencia, California.

50.     Along the way, Dr. Miller stopped at a residence that he stated was his home.

51.     He brought Plaintiff H. M. inside, gave her money, cooked her a meal, and gave her a tour, which ended in the bedroom. There, Dr. Miller had sex with Plaintiff H. M.

52.     He then drove her to her step-aunt's home in Valencia.

53.     Dr. Miller would text and call Plaintiff H. M. every day after she was released.

54.     He would be angry if she did not answer his calls or text him back immediately.

55.     He would visit about once a month and take her to a hotel to have sex with her, or have sex with her in her home if her step-aunt was not there.

56.     He was forceful about getting his way during sex. For instance, on occasions where Plaintiff H. M. would request that he wear a condom, he would refuse and insist on sex anyway.

57.     He would use Plaintiff H. M.'s confessions to him about her prior relationships to manipulate her.

58.     Plaintiff H. M. would always acquiesce because she did not want to upset him for fear of what he might do.

59.     Dr. Miller's controlling behavior escalated. He started arriving in town unannounced and demanding that she drop everything she was doing to be intimate with him.

60.     If she protested, he would get angry and begin manipulating her using her past sexual history and the intimate details about her past romantic relationships that he had learned about through his inappropriate questions in therapy.

61.     He would descend on her uninvited while she was at the grocery store or running errands in town, and somehow always knew where she was without having told him.

62.     To this day, Plaintiff H. M. has no idea how he knew where to find her on those occasions.

63.     Dr. Miller told Plaintiff H. M. that he had a military and CIA background, and Plaintiff H. M. feared that he was using these connections to track her.

64.     One day, in early 2020, Dr. Miller showed up unexpectedly at Plaintiff H. M.'s home and told her that they had to take a break.

65.     He reassured her that it would be brief and that he would come back for her.

66.     Plaintiff H. M. waited patiently as he had instructed. She spent some time being afraid that he would reappear unannounced or that he was watching her.

67.     As it was, she did not see him again.

68.     Dr. Miller carried on with Plaintiff H. M. for nearly two years after her release, during which Plaintiff H. M. was on supervised release.

69.     Plaintiff H. M. did not confide in anyone because she was afraid of Dr. Miller and of his connections to the prison, the military, and the CIA.

70.     She knew that he knew where she lived, and even if she left, she feared that he would just find her as he had at the various locations around town.

71.     Plaintiff H. M. feared for her safety if she ever reported his conduct to the prison.

72.     Her understanding of the degree of control and manipulation Dr. Miller had over her was also fogged by his weaponization of her past experience with men, her sexual trauma, and the intimate details of her life.

73.     Shortly after Dr. Miller ended his abuse of Plaintiff H. M., Plaintiff H. M. was sexually abused by her step-aunt's husband, she was diagnosed with two autoimmune disorders that debilitated her, and her son died.

74.     Plaintiff H. M. could not tell up from down, and surviving day-to-day became her primary focus.

1      75.    Further, as time went on, Plaintiff H. M. was able to more fully appreciate the

2  manipulation and control that Dr. Miller exerted that coerced her into a sexual relationship with

3  him.

4      76.    Plaintiff H. M. spent years trying to recover from the trauma of being preyed upon

5  and manipulated by a trusted mental healthcare provider.

6      77.    She experiences tremendous anxiety, self-doubt, and dissociation when trying to

7  process the experience.

8      78.    Plaintiff H. M. desperately wants to see a therapist again, especially to help her with

9  the loss of her son, but she becomes overcome with terror and anxiety when she meets with a

10  therapist and cannot continue her sessions.

11      79.    The distrust has led her to fight through these periods of extreme sorrow without

12  the benefit of counseling.

13                          **EXHAUSTION**

14      80.    On February 27, 2025, Plaintiff H. M., through counsel, mailed an administrative

15  claim under the FTCA to the BOP's Western Regional Office.

16      81.    The BOP acknowledged receipt on March 4, 2025.

17      82.    The BOP has not substantively responded to her claim.

18                      **EQUITABLE TOLLING**

19      83.    The culture of sexual abuse at FCI Dublin is well documents, and Plaintiff H.M. was

20  incarcerated there during a time where sexual abuse was rampant and Federal Court oversight

21  was not yet contemplated.

22      84.    Consistent with that culture, Plaintiff H.M. witnessed sexual abuse, experienced

23  sexual abuse from many officers who operated with impunity, and witnessed other prisoners be

24  retaliated against when they spoke up.

25      85.    Dr. Miller, in addition to being a BOP employee, reported to Plaintiff H.M. that he

26  had experience with the military and the CIA, which further compelled Plaintiff H.M.'s

27  acquiescence and silence.

28

*H. M. v. United States of America*, No.
Complaint for Damages and Jury Demand - 8

86.    Plaintiff H.M. feared retaliation by Dr. Miller as well as other FCI Dublin officers if she were to have reported Dr. Miller while incarcerated at FCI Dublin or under BOP supervision.

87.    Plaintiff H.M. had witnessed other women report officers for sexual abuse and be sent to the SHU.

88.    Placement in the SHU could mean loss of privileges including not being able to use the phone or talk to loved ones on the outside, not being able to go outside freely, and not accessing commissary and other food and hygiene items.

89.    Additionally, Plaintiff H.M. had witnessed invasive cell searches where officers would raid a prisoner's cell as a retaliatory mechanism to ensure a prisoner's silence.

90.    During these invasive cell searches, officers would look through all items in the cell including private legal documents, throw papers all over the room or in the trash, destroy commissary items and other products, and tear up or throw away letters and photographs from loved ones that were often irreplaceable.

91.    Plaintiff H.M.'s years of being at FCI Dublin showed her that these forms of retaliation were regular occurrences and that officers regularly looked out for one another and protected one another.

92.    This Court could reasonably conclude that H.M. suffered extraordinary circumstances preventing her from reporting the abuse while she was incarcerated at FCI Dublin.

93.    Likewise, H.M.'s continued placement on supervised release, under the power of parole officers who also looked out for correctional staff, did not ease H.M.'s legitimate concerns and fear of retaliation.

94.    She believed that if she reported Dr. Miller while she was on supervised release, he could send her back to prison.

95.    Furthermore, Dr. Miller's stalking, sudden and unannounced appearances at locations H.M. had not disclosed to him, and reference to his military and CIA background, made H.M. scared that Dr. Miller might physically assault her or worse if she were to report him. In addition to the conditions at FCI Dublin and the consequences she reasonably feared from Dr.

1    Miller, Plaintiff H.M. suffered a sexual assault and the loss of her son. She suffered severe mental

2    anguish and trauma that led to mental health challenges from which she is working to overcome.

3         96.    Plaintiff H.M. finally decided to come forward in January of 2025 after she heard

4    that other former and current prisoners from FCI Dublin were being believed about the sexual

5    violence they suffered and that the DOJ was prosecuting officers.

6         97.    At this point, H.M. finally felt safe to come forward.

7         98.    H.M. engaged the undersigned counsel on January 30, 2025, and the undersigned

8    diligently filed an SF-95 for her within a month of being engaged.

9         99.    This complaint is being filed by the date permitted by statute.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**GENDER VIOLENCE**
**(FTCA Action against the United States)**
**(Cal. Civ. Code § 52.4)**

100.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in

the preceding paragraphs as if fully set forth herein.

101.    Plaintiff H. M. brings this claim under the Federal Tort Claims Act for gender

violence under California Civil Code § 52.4 against the United States based on the conduct of its

employee Defendant Miller.

102.    The United States is named as a defendant for the acts of these individual

employees under the Federal Tort Claims Act.

103.    These federal employees engaged in the wrongful conduct alleged while in the

course and scope of their employment as federal employees.

104.    Defendant Miller's position as a mental health worker holding himself out as a

licensed psychologist was essential to his commission of tortious misconduct, which could not

have occurred absent his federal employment.

105.    Under California law, any person subjected to gender violence may bring a civil

action for damages. Gender violence is a form of sex discrimination that includes a physical

intrusion or invasion of a sexual nature under coercive conditions.

1    106.    Defendant Miller discriminated against Plaintiff H. M. based on her gender when he

2    repeatedly sexually abused her by physically subjecting her to sexual acts under coercive

3    conditions.

4    107.    By these acts, Defendant Miller caused Plaintiff H. M. physical, mental, and

5    emotional injuries as well as injury to her personal dignity.

**SECOND CLAIM FOR RELIEF**
6    **SEXUAL ASSAULT**
7    **(FTCA Action against the United States)**
8    **(Cal. Civ. Code § 1708.5)**

9    108.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in

10    the preceding paragraphs as if fully set forth herein.

11    109.    Plaintiff H. M. brings this claim for sexual assault under the Federal Tort Claims Act

12    for violation of California Civil Code § 1708.5 against the United States based on the conduct of its

13    employee Defendant Miller.

14    110.    Defendant Miller violated Plaintiff H. M.'s right to be free from sexual assault by

15    repeatedly sexually abusing her while she was incarcerated, immediately upon her release from

16    prison, and during her supervised release.

17    111.    Defendant Miller's sexual abuse of Plaintiff H. M. was deeply offensive to her

18    personal dignity and would offend a person of ordinary sensitivity.

19    112.    Defendant Miller subjected Plaintiff H. M. to these sexual acts with the intent to

20    cause a harmful or offensive contact with Plaintiff H. M.'s person.

21    113.    By intentionally subjecting Plaintiff H. M. to sexual acts, Defendant Miller acted

22    maliciously, in a manner that is deeply offensive to human dignity and void of any penological

23    justification.

24    114.    By repeatedly subjecting Plaintiff H. M. to sexual acts, Defendant Miller caused her

25    to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

26    ///

27    ///

28    ///

1
2
3

**THIRD CLAIM FOR RELIEF**
**SEXUAL BATTERY**
**(FTCA Action against the United States)**
**(California State Law)**

4      115.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in

5  the preceding paragraphs as if fully set forth herein.

6      116.    Plaintiff H. M. brings this claim for sexual battery under the Federal Tort Claims Act

7  based on California state law against the United States for the conduct of its employee Defendant

8  Miller.

9      117.    Defendant Miller committed sexual battery against Plaintiff H. M. by repeatedly

10  sexually abusing her while she was incarcerated at FCI Dublin, immediately upon her release, and

11  during her supervised release.

12      118.    The sexual abuse of Plaintiff H. M., a prisoner in the custody of the BOP, was deeply

13  offensive to her personal dignity, would offend a person of ordinary sensitivity, and was

14  unwarranted by the social usages in prison when the contact was made.

15      119.    Defendant Miller subjected Plaintiff H. M. to these sexual acts with the intent to

16  cause a harmful or offensive contact with Plaintiff H. M.'s person.

17

**FOURTH CLAIM FOR RELIEF**
**BATTERY**
**(FTCA Action against the United States)**
**(California State Law)**

18
19

20      120.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in

21  the preceding paragraphs as if fully set forth herein.

22      121.    Plaintiff H. M. brings this claim under the Federal Tort Claims Act for battery

23  against the United States based on the conduct of Defendant Miller.

24      122.    Defendant Miller engaged in outrageous conduct by repeatedly subjecting Plaintiff

25  H. M. to unwanted touching while she was incarcerated in his employer's custody. He abused his

26  authority over Plaintiff H. M. and his power to affect her in a manner that was beyond all bounds

27  of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

28      123.    Defendant Miller's unwanted touching caused Plaintiff H. M. to suffer, and continue

to suffer, severe emotional distress, including fear, depression, and anxiety. This distress was so

1    substantial and enduring that no reasonable person in a civilized society should be expected to

2    endure it.

3        124.    Defendant Miller intended to cause Plaintiff H. M. this harm because he knew that

4    emotional distress was likely to result from his sexual abuse of a prisoner and as a patient under

5    his care.

**FIFTH CLAIM FOR RELIEF**
6    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
7    **(FTCA Action against the United States)**
**(California State Law)**
8

9        125.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in
10    the preceding paragraphs as if fully set forth herein.

11        126.    Plaintiff H. M. brings this claim under the Federal Tort Claims Act for the
12    intentional infliction of emotional distress against the United States based on the conduct of
13    Defendant Miller.

14        127.    Defendant Miller engaged in outrageous conduct by repeatedly subjecting Plaintiff
15    H. M. to sexual acts while she was incarcerated in his employer's custody. He abused his authority
16    over Plaintiff H. M. and his power to affect her in a manner that was beyond all bounds of
17    decency and must be regarded as atrocious and utterly intolerable in a civilized society.

18        128.    Further, Defendant Miller's conduct occurred despite the American Psychological
19    Association's code of ethics forbidding romantic or sexual relationships with patients and former
20    His conduct demonstrates clearly outrageous conduct that no reasonable person in a civilized
21    society should be expected to endure.

22        129.    Defendant Miller's sexual abuse caused Plaintiff H. M. to suffer, and continue to
23    suffer, severe emotional distress, including fear, depression, and anxiety. This distress was so
24    substantial and enduring that no reasonable person in a civilized society should be expected to
25    endure it.

26        130.    Defendant Miller intended to cause Plaintiff H. M. this emotional distress because
27    he knew that emotional distress was likely to result from his sexual abuse of a prisoner and as a
28    patient under his care.

**SIXTH CLAIM FOR RELIEF**
**BANE ACT**
**(FTCA Action against the United States)**
**(Cal. Civ. Code § 52.1)**

131.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

132.    Defendant United States, by the actions of its employee Defendant Miller, while Plaintiff H. M. was in custody and/or on supervised release, by threat, intimidation, and/or coercion, violated Plaintiff H. M.'s rights under California Civil Code § 52.1 by interfering with her right to protection from bodily restraint, harm, and insult, as secured by California Civil Code § 43; her rights under the California Constitution to be free of the imposition of punishment without due process, cruel and unusual punishment, and the right to be free from sexual violation; and her right under the Eighth amendment to be free of cruel and unusual punishment.

133.    As a proximate result of these acts, Plaintiff H. M. sustained damage and injury.

**SEVENTH CLAIM FOR RELIEF**
**TRAFFICKING VICTIMS PROTECTION ACT**
**(against all Defendants)**
**(18 U.S.C. § 1581, *et seq.*)**

134.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

135.    Defendant Miller knowingly recruited, enticed, and solicited Plaintiff H. M. by threat, coercion, and manipulation and by offering benefits and things of value for engaging in sex acts.

136.    Defendant Miller made Plaintiff H. M. engage in sex acts through threat, intimidation, coercion, and manipulation.

137.    This conduct has caused Plaintiff H. M. serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

///
///
///

1

2

**EIGHTH CLAIM FOR RELIEF**
**CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT**
**(against all Defendants)**
**(Cal. Civ. Code § 52.5)**

3

4

138.    Plaintiff H. M. repeats and incorporates by reference every allegation contained in

5

the preceding paragraphs as if fully set forth herein.

6

139.    Defendant Miller knowingly recruited, enticed, and solicited Plaintiff H. M. by

7

threat, coercion, and manipulation and by offering benefits and things of value for engaging in

8

sex acts.

9

140.    Defendant Miller made Plaintiff H. M. engage in sex acts through threat,

10

intimidation, coercion, and manipulation.

11

141.    This conduct has caused Plaintiff H. M. serious harm, including, without limitation,

12

physical, psychological, emotional, financial, and reputational harm.

13

**PUNITIVE DAMAGES**

14

142.    In taking the actions described above, Defendant Miller intentionally and

15

maliciously violated Plaintiff H. M.'s civil rights and/or acted with reckless disregard as to

16

whether his actions violated Plaintiff H. M.'s civil rights.

17

143.    In taking the actions described above, the individual Defendant Miller acted with

18

oppression, fraud, and/or malice.

19

144.    As such, Plaintiff H. M. claims punitive damages against Defendant Miller in an

20

amount to be determined by a jury.

21

**PRAYER FOR RELIEF**

22

145.    Plaintiff H. M. prays for judgment against Defendants, and each of them, as follows:

23

(a)    An award of damages, including compensatory, special, punitive, and

24

nominal damages, to Plaintiff H. M. in an amount to be determined at trial;

25

(b)    An award to Plaintiff H. M. of the costs of this suit and reasonable attorneys'

26

fees and litigation expenses including expert witness fees; and

27

(c)    For such other and further relief as this Court may deem just and proper.

28

1

**JURY TRIAL DEMAND**

2        146.    Plaintiff H. M. hereby respectfully demands a jury trial, pursuant to Rule 38 of the

3    Federal Rules of Civil Procedure.

4

5        Dated: September 8, 2025

6                                          SIEGEL, YEE, BRUNNER & MEHTA

7

8                                          By:_____
                                               EmilyRose Johns
9

10

11                                         By: /s/ *Deborah M. Golden*
                                               Deborah M. Golden
12                                             DC Bar # 470-578
                                               Motion for *pro hac vice* forthcoming
13

14                                         *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28